[Cite as *Mal-Sarkar v. Cleveland State Univ.*, 2010-Ohio-5913.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

SANCHITA MAL-SARKAR, Admx., et al.

    Plaintiffs

    v.

CLEVELAND STATE UNIVERSITY

    Defendant
    Case No. 2006-02331

Judge Joseph T. Clark

DECISION

{¶ 1}   Plaintiffs, Sanchita Mal-Sarkar, as the estate administratrix and next of kin of Tarun Mal, and Tatini Mal-Sarkar, brought this wrongful death action alleging a claim of employer intentional tort.  The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2}   Tarun Mal, Ph.D., was employed by defendant, Cleveland State University (CSU), as an associate professor in the department of biology.  Part of Dr. Mal's teaching responsibilities included conducting botany experiments with his students at a laboratory located in CSU's Basic Sciences Building.  On August 15, 2005, Dr. Mal was working with two students at the laboratory when he was electrocuted.

{¶ 3}   After one of the students had suggested that an experiment at the greenhouse on the building's fourth floor be moved to the laboratory, Dr. Mal and the student began examining potential work spaces and decided to utilize a three-tiered metal rack that was equipped with two florescent light fixtures suspended from the top tier.  The light fixtures were attached to the rack with copper wire.  A by-pass adapter, also known as a "cheater plug," was attached to the three-prong light plug.  The adapter

plug allowed the three-prong light plug to be attached to a two-prong timer device that controlled the lighting sequence; however, the adapter eliminated the ground path. Unbeknownst to Dr. Mal, a ballast in one of the florescent lights was defective, causing the metal rack to be energized. Dr. Mal was allegedly holding onto the metal rack, crouching down between the rack and a steel work sink, and attempting to plug the timer into a wall receptacle when he was electrocuted. Both of the students were looking away from Dr. Mal at the time. It is undisputed that the light rack assembly was not purchased, put into use, or authorized by CSU. Neither party could establish when the rack, light fixtures, timer, and by-pass adapter were acquired or if they had ever previously been put into use at the laboratory.

{¶ 4} The parties stipulated that CSU was obligated to comply with all applicable regulations of the Occupational Safety and Health Administration (OSHA) and the Public Employees Risk Reduction Program (PERRP).[1] Plaintiffs contend that CSU's deliberate failure both to comply with OSHA requirements for routine inspections of electrical equipment and wiring in their laboratories and to provide electrical safety training to its employees, including faculty, was the proximate cause of Dr. Mal's death. Plaintiffs also allege that the proximity of electrical equipment to sinks and water, which were needed for botany experiments, the use of cheater plugs, and the lack of ground fault circuit interrupters (GFCIs)[2] contributed to the unsafe conditions in the laboratory.

---

[1]In putting PERRP into effect, the Bureau of Workers' Compensation was required to adopt all OSHA standards. R.C. 4167.07 provides in pertinent part:

"(A) The administrator of workers' compensation, with the advice and consent of the bureau of workers' compensation board of directors, shall adopt rules that establish employment risk reduction standards. * * * in adopting these rules, the administrator shall * * *:

"(1) * * * adopt as a rule and an Ohio employment risk reduction standard every federal occupational safety and health standard then adopted by the United States secretary of labor pursuant to the 'Occupational Safety and Health Act of 1970 * * *.'"

[2]A GFCI is a safety device that detects fluctuations in current and breaks the circuit to prevent electrocution.

{¶ 5}   R.C. 2745.01, "Employer's liability for intentional tort," provides in pertinent part:

{¶ 6}   "(A) In an action brought against an employer by an employee, or by the dependent survivors of a deceased employee, for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.

{¶ 7}   "(B) As used in this section, 'substantially certain' means that an employer acts with *deliberate intent* to cause an employee to suffer an injury, a disease, a condition, or death." (Emphasis added.)

{¶ 8}   At the time of trial, the constitutionality of R.C. 2745.01, which became effective approximately four months before Dr. Mal's death, was in question. Consequently, the parties framed their arguments in terms of the common-law employer intentional tort standard set forth in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115.  In that case, the Supreme Court of Ohio held that, "in order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated:  (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task."  Id. at paragraph one of the syllabus.  (Additional citations omitted.)

{¶ 9}   Subsequent to the trial, the Ohio Supreme Court issued decisions in two companion cases wherein it upheld the constitutionality of R.C. 2745.01.  See *Kaminski*

*v. Metal & Wire Prods. Co.*, 125 Ohio St.3d 250, 2010-Ohio-1027; *Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 125 Ohio St.3d 280, 2010-Ohio-1029.[3]   The statutory standard is more restrictive than that expressed in *Fyffe*.  In *Kaminski*, the court observed that:  "the General Assembly's intent in enacting R.C. 2745.01, as expressed particularly in 2745.01(B), is to permit recovery for employer intentional torts *only* when an employer acts with specific intent to cause an injury * * *."  (Emphasis added.)  Id. at ¶56.  The court went on to explain that "'* * * it would be inappropriate for the judiciary to presume the superiority of its policy preference and supplant the policy choice of the legislature.  For it is the legislature, and not the courts, to which the Ohio Constitution commits the determination of the policy compromises necessary to balance the obligations and rights of the employer and employee in the workers' compensation system.'"  Id. at ¶75, quoting *Bickers v. W. & S. Life Ins. Co.*, 116 Ohio St.3d 351, 2007-Ohio-6751.  Thus, the court concluded that, "[b]ecause R.C. 2745.01 is constitutional, the standards contained in the statute govern employer intentional tort actions, and the statutory standards apply rather than the common-law standards of *Fyffe*."  Id. at ¶103.

{¶ 10} In support of their claim, plaintiffs submitted a set of documents concerning the investigation of Dr. Mal's death that was conducted by Glenn McGinley, a PERRP Safety and Health Consultant, who worked in conjunction with a number of CSU officials, and Anthony Medina, a Safety Violations Special Investigator from the Bureau of Workers' Compensation.  (Plaintiffs' Exhibits 5(A) and 5.)  The parties stipulated that the Investigative Report, Investigative Findings, Violation Notice, and Citations "reflect conditions in the lab at issue in the case, and at Cleveland State

---

[3]In *Kaminski*, the court held that R.C. 2745.01, effective April 7, 2005, does not conflict with the legislative authority granted to the General Assembly by Sections 34 and 35, Article II of the Ohio Constitution.  Id. at the syllabus.

In *Stetter*, the court held that the statute "does not violate the Ohio Constitution's trial-by-jury provision (Section 5, Article I), the right-to-a-remedy and open-courts provisions (Section 16, Article I), the due-course-of-law provision (Section 16, Article I), the equal protection provision (Section 2, Article I), or

University on August 1[5], 2005 prior to Dr. Mal's death." It was further stipulated that "[CSU] admitted to the citations and violations contained in Exhibit 5 and the factual basis for them." (Plaintiffs' Exhibit 5(A) and 5.)

{¶ 11} In addition to the parties' stipulations, plaintiffs presented the testimony of three CSU employees: Harry Ratka, an electrical maintenance foreman; Christopher Wilson, P.E., the Director of Utilities, and Paul Novak, the Director of Environmental Health and Safety. Plaintiffs also offered the deposition testimony of Debroop Sarkar, one of the students who was in the lab when Dr. Mal was electrocuted, and the expert testimony of Richard Hayes, a journeyman electrician and president of Hayes Environmental Services, Inc., a health and safety organization who had investigated approximately 3,000 work-place fatalities.

{¶ 12} The testimony of Ratka, Novak, and Wilson established that prior to Dr. Mal's death their respective departments did not provide electrical safety training for faculty or other staff, nor did they conduct routine inspections of CSU's 200 laboratories. Wilson testified that Ratka and the electrical-shop staff reported to him, and that they would get service requests from professors asking for repair work, but that they could not enter the labs unless the professors granted access. He related that he had once questioned his supervisors about the matter and was advised that "the labs are under the jurisdiction of the academic side of the university, and that because of the nature of things going on in the labs; research that could involve radiation, growing of germs, those sort of things, that unless somebody knew what the hazards were in those rooms, they shouldn't be going in unescorted." (Transcript, Page 166, Lines 1-8.) The testimony was consistent that the lack of unlimited access to the labs interfered with the staff's ability to perform inspections.

{¶ 13} Both Ratka and Wilson acknowledged that the proximity of water and electricity in the botany labs could create a special hazard for the faculty and students. Wilson testified that "where you are using electrical equipment [in] water or damp conditions, good prudence and safety mandates the use of GFCIs." (Transcript, Page 178, Lines 4-11.) Both Ratka and Wilson recognized that federal and state regulations existed which required training and inspections to guard against potential hazards.

the separation-of-powers doctrine and is therefore constitutional on its face." Id. at paragraph one of the syllabus.

However, Wilson also testified that electrical safety training of students and professors would be required only "if they were doing electrical work similar to what an electrician was doing * * *." (Transcript, Page 175, Lines 11-17.)

{¶ 14} Novak, whose department was responsible for maintaining CSU's compliance with health and safety mandates, also testified that the OSHA regulation that required safety training, "was very clear in listing certain occupations, blue collar supervisors, electricians, and so forth * * * it says, and other people who reasonably can be expected to face or be exposed to a risk of shock. And faculty members were not expected to face an unreasonable amount of risk to electrical shock." (Transcript, Page 147, Lines 19-24 and Page 148, Lines 1-5.) Ratka's testimony confirmed that the electrical department staff was "highly trained" in safety hazards but not other university staff. (Transcript, Page 65, Lines 19-24.) Ratka also related that the use of cheater plugs was prohibited by the National Electric Code (NEC) and that if he saw them in use anywhere throughout the university, albeit rarely, he would confiscate them, and leave his business card with a warning noted. According to Ratka, the 2005 NEC required GFCIs in places such as restroom areas of noncommercial buildings, but not in areas such as Dr. Mal's botany lab, which was constructed in the 1970s.

{¶ 15} Hayes, plaintiffs' expert, testified that the fluorescent light and rack assembly in Dr. Mal's lab was unsafe and an obvious violation of the PERRP. He stated that CSU was required to conduct inspections for such hazards, which could cause physical harm or death. Hayes noted that, although GFCIs cost only $7 to $8, none were installed in Dr. Mal's botany lab. He testified that there was "no question" in his mind that a GFCI would have saved Dr. Mal's life. (Deposition, Page 43, Lines 11-15.) It was his opinion that, under the circumstances presented in the botany lab, including the metal rack being located close to a utility sink, a GFCI was required by both OSHA regulations and the NEC. (Deposition, Page 45, Lines 16-25 and Page 46, Lines 1-8.) Hayes also opined that electrical safety training was required for CSU employees, including those such as Dr. Mal.[4] He further opined that because of the

---

[4]One of the PERRP citations that defendant stipulated to was that "[a]n employee was not trained in or familiar with the safety-related work practices * * * that pertained to his or her job assignment." The citation was based upon a finding that "* * * employees were not trained in the safe use of flexible cords, ground by-pass adapters, outlet capacities, and the importance of equipment ground connections." (Plaintiffs' Exhibits 5(A) and 5.)

hazardous conditions that existed in the lab "the event that occurred to Dr. Mal was substantially certain to occur, it was substantially certain to result in his death * * *." (Deposition, Page 65, Lines 7-10.)

{¶ 16} In response to plaintiffs' evidence, defendant presented by deposition the expert testimony of Ralph Dolence, a licensed electrician, forensic investigator, and president of Dolence Electric Company. Dolence also investigated the incident shortly after its occurrence at the request of the county coroner. He testified that "there was nothing wrong with the electrical system or the wiring in the [botany lab] at CSU." (Deposition Page 31, Lines 13-16.) Dolence noted that there were no PERRP citations concerning the lack of GFCIs or routine inspections of Dr. Mal's laboratory. (Deposition, Page 195, Lines 3-19.)

{¶ 17} Dolence testified that he did not observe running water in the sink located next to the metal light rack assembly, or in the laboratory when he was there. (Deposition, Page 48, Lines 13-17.) According to Dolence, the laboratory would not be defined as a wet area such that GFCIs would be required under the 2005 NEC. (Deposition, Page 60, Lines 7-18.) He also recited at length the NEC designations of areas that would require GFCIs, such as bathrooms, unfinished basements, kitchens, laundries, and boathouses. (Deposition, Page 59, Lines 11-17.) Dolence was not of the opinion that the presence of GFCIs in the laboratory would unquestionably have saved Dr. Mal's life. (Deposition, Page 62, Lines 2-21.)

{¶ 18} With regard to inspections, Dolence testified that employers were required to inspect hazardous areas within the workplace, that it is the employer's duty to define an area as hazardous, and it is the employer's duty to establish a program. He stated that if an area was not considered hazardous, an inspection once every five years would comply with state regulations and that, in a defined hazardous area, an inspection every three months may be necessary. (Deposition, Page 154, Lines 20-25 and Page 155, Lines 1-6.)

{¶ 19} Dolence also opined that OSHA standards did not require that Dr. Mal be trained in electrical safety. (Deposition, Page 95, Lines 14-19.) He stated that the regulation applied to "employees facing higher than normal risk of electrical accidents" including "blue-collar supervisors, electrical and electronic engineers * * * industrial machine operators * * * mechanics and repairers * * *." (Deposition, Page 81, Lines 15-

25.)  In short, Dolence did not believe that any culpable action or omission on the part of CSU caused Dr. Mal's death.

{¶ 20} Upon review of the testimony and other evidence presented, the court is convinced that, although CSU may have violated certain PERRP and OSHA regulations, such violations do not rise to the level of either tortious acts committed with the intent to injure or actions committed with deliberate intent to cause injury for purposes of R.C. 2745.01(A) and (B).

{¶ 21} Further, even assuming that the lower standard of *Fyffe* were to be applied, the court explained in that case:  "[t]o establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established.  Where the employer acts despite his knowledge of some risk, his conduct may be negligence.  As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness.  As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result.  However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." *Fyffe*, supra, at paragraph two of the syllabus, citing *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, at paragraph six of the syllabus.

{¶ 22} The key to the common law standard was knowledge on the part of the employer and a conscious decision to proceed despite a substantial certainty that harm to employees would result.  In this case, the parties agree that the metal light-rack assembly was not purchased, put into use, or authorized by CSU, and that it could not be established when the assembly was acquired, or if it had been put into use at the lab prior to Dr. Mal's death.  There is no evidence that CSU knew or could predict that faculty, other staff, or students, might opt to bring in or utilize equipment such as that which caused Dr. Mal's death.  Even if CSU had provided electrical-safety training, or had conducted routine inspections, there is no way of determining in this case whether inspectors would both have been on-site at a time when the unauthorized equipment had been put into use and have been able to warn employees against its use prior to Dr. Mal's death.  Similarly, there is no way that any failure to train employees such as

Dr. Mal against the use of cheater plugs or the importance of GFCIs could give rise to substantial certainty of injury, inasmuch as the presence of the metal rack assembly was not known and could not reasonably have been anticipated.

{¶ 23} In short, the court finds for the foregoing reasons that plaintiffs failed to prove their employer intentional tort claim under either the statutory or common law standard.[5]  Accordingly, judgment shall be rendered in favor of defendant.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

SANCHITA MAL-SARKAR, Admx., et al.

    Plaintiffs

    v.

CLEVELAND STATE UNIVERSITY

    Defendant
     Case No. 2006-02331

Judge Joseph T. Clark

JUDGMENT ENTRY

This case was tried to the court on the issue of liability.  The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant.  Court costs are assessed against

---

[5]Based upon the above, the parties cross-motions for dismissal pursuant to Civ. R. 41(B)(2) at the close of the proceedings are DENIED as moot.

plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

Eric A. Walker
Randall W. Knutti
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Jaime M. Bouvier
Subodh Chandra
1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

W. C. Bashein
Terminal Tower, 35th Floor
50 Public Square
Cleveland, Ohio 44113-2216

LH/cmd/Filed November 17, 2010/To S.C. reporter December 1, 2010